UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
3:06-CV-597-H

FRONTIER INSURANCE COMPANY                                    PLAINTIFF
        IN REHABILITATION

V.

M C MANAGEMENT, INC., et al.                                 DEFENDANTS

RLM CONSTRUCTION COMPANY, INC.           THIRD PARTY PLAINTIFFS
and
ROBERT MCAULIFFE

V.

BROOK SMITH                                       THIRD PARTY DEFENDANT

**MEMORANDUM OPINION**

        This lawsuit arose after MC Management defaulted on a construction contract for the

Haverford Place development in Georgetown, Kentucky.  Plaintiff, Frontier Insurance Company

in Rehabilitation ("Frontier"), had issued payment bonds for the project and eventually made

payments under their terms. Frontier now seeks to recover from MC Management, M. C.

Construction. Inc., Mark Campisano ("Campisano"), Beverly Campisano, RLM Construction

Company ("RLM"), and Robert McAuliffe ("McAuliffe") (collectively "Defendants") as

signatories to a 1995 General Agreement of Indemnity under the bonds.   RLM and McAuliffe

also filed a counterclaim against Frontier, asserting fraud.  RLM and McAuliffe filed a third-

party complaint against Brook Smith ("Smith"), a Frontier agent, claiming fraud and indemnity.

        Frontier has moved for partial summary judgment on its claims for indemnification of the

sums paid under the payment bond and enforcement of the collateral security provision of the

indemnity agreement.  RLM and McAuliffe have also moved for summary judgment against

Frontier.  Frontier further moved for dismissal of RLM and McAuliffe's counterclaim.  RLM and McAuliffe moved for summary judgment against Brook Smith on the claims of fraud and indemnity.  Brook Smith moved for summary judgment on RLM and McAuliffe's third party complaint.

The Court will address each of these motions.  Initially, it seemed improbable that Frontier could maintain an indemnity claim against McAuliffe and RLM in these circumstances.  After thoroughly reviewing the contractual documents and exploring all of the reasons for not applying their express terms, however, the Court concludes that Frontier is entitled to a remedy under the 1995 General Agreement of Indemnity.

## I.

As always, it is important to understand the factual context.

Campisano and McAuliffe have worked independently and jointly in the general contracting business for many years and under several company names.  In 1994, McAuliffe formed RLM.  In 1992 Campisano formed M.C. Construction, Inc.  Two years later, he then formed the company MC Management.  In 1996, the two jointly formed several companies, which have no interest in this lawsuit.

For many of their specific projects, Campisano and McAuliffe obtained payment and performance bonds.  Payment bonds ensure payment to subcontractors and vendors when the general contractor does not pay them.  Performance bonds ensure payment for completion of the project in the event that the general contractor is unable to complete the project.  Prior to issuing such bonds, a surety company, such as Frontier, will often require individuals associated with a principal to execute an indemnity agreement.  In this way, the surety can recover from individual

indemnitors in the event of default.

Defendants have signed two indemnity agreements with Frontier.  First, M.C. Construction, Inc., Campisano, McAuliffe, Beverly Campisano, and Julie McAuliffe signed a General Agreement of Indemnity on January 21, 1992 (the "1992 GAI").  Campisano and McAuliffe signed both in their personal capacity and as officers of M. C. Construction.  Second, M.C. Construction, Campisano, McAuliffe, Beverly Campisano, MC Management and RLM executed a General Agreement of Indemnity on November 30, 1995 (the "1995 GAI").[1] Campisano signed as the representative of M. C. Construction and MC Management Company. McAuliffe signed as the representative of RLM.  Defendants believe the 1995 GAI replaced the 1992 GAI.  Generally, the parties pledged their corporate and personal financial assets to Frontier should there be a loss on the bonds.

The 1995 GAI contained very specific provisions to assure Frontier's rights against all of the indemnitors.  It provided for "cross-collateralization," in which each indemnitor signed for all and all indemnitors signed for each one.  The meaning of this provision has far reaching and undoubted consequences.  The parties maximize their bonding capacity as all parties indemnify the bonds issued to any parties under the GAI.  The bonds issued under that agreement are enforceable against all parties.  It states:

> The Indemnitors hereby acknowledge that this agreement is intended to cover any bonds (whether or not covered by any application signed by any one or more of the indemnitors-such application to be considered between the parties hereto as merely supplementary to this general agreement of indemnity) heretofore or hereafter executed by the company on behalf of the indemnitors, or any one of them (whether contracting alone or as a joint or co-adventurer), from time to time,

[1] Julie McAuliffe and Robert McAuliffe divorced in 1994. Therefore, Julie McAuliffe did not execute the 1995 GAI.

and over an indefinite period of years, until this agreement shall be cancelled in
accordance with the terms hereof.

(emphasis omitted).  In other words, any of the parties included in the designation 'indemnitors'

can be jointly and severally liable.  That liability is not affected "by any claim that other

indemnity or security was to have been obtained, nor by the release of any indemnity . . ."  The

indemnitors are also required to post collateral to cover any claim under a bond, when Frontier

demands it.  Further, the GAI expressly disclaims any notice requirement for issuing bonds by

stating:

> . . . it shall not be necessary for the Company to give the Indemnitors, or
> any one or more of them, notice of the execution of any such bonds, nor of any
> fact or information coming to the notice or knowledge of the Company affecting
> its rights or liabilities, or the rights or liabilities of the Indemnitors under any such
> bond executed by it, notice of all such being hereby expressly waived . . .[2]

Importantly, the indemnitors may terminate the agreement by written notice to the Company,

relieving themselves of future liability.  Defendants also executed resolutions clearly stating that

both RLM and MC Management were materially interested when either M. C. Construction,

Inc., MC Management Company, or RLM had applied or may later apply to Frontier for surety

bonds.

The particular events leading to this lawsuit began in December 1999.  At that time,

Campisano and John Delaney ("Delaney"), a construction developer/owner, discussed an

apartment complex project in Georgetown, Kentucky, which became known as Haverford Place.

On February 9, 2000, Campisano's company, MC Management, entered into a construction

contract to serve as the general manager on the project.  Campisano also became a 30% member

---

[2] David Campbell, a Frontier representative does, however, testify that if a new bond was being issued
several years after a GAI was executed, the company would have some duty to give notice to other indemnitors if
Frontier had a sense that those indemnitors were estranged from the party seeking the bond.

of the Haverford Place II, LLC (the "Owner"), the project owner.  Delaney was the managing member.  Since the project was federally guaranteed through HUD, the contract required MC Management to obtain payment and performance bonds.

Prior to entering the contract, Campisano contacted his insurance agent Brook Smith ("Smith") of Smith-Manus Agency for appropriate underwriting of the bonds.  Campisano and Smith had a long-standing personal and professional relationship.  Smith recommended Frontier Insurance Company.  Prior to issuing the bonds, Smith requested personal and business financial information, tax returns for the previous three years, and financial statements from Campisano, his wife Beverly, and MC Management.  Smith did not request any information from McAuliffe, RLM Construction, or any other entity.

Smith also contacted Delaney requesting additional information.  Neither Campisano nor Delaney represented that McAuliffe, RLM, or any entity other than MC Management was involved in the Haverford Place project.  At the closing of the project loan on February 9, 2000, Frontier executed a Performance Bond and a Payment Bond, with MC Management as principal.[3]  At that time Smith presented Campisano with a new General Agreement of Indemnity (the "2000 GAI") and a letter from a Smith-Manus employee directing Campisano to execute the 2000 GAI "as soon as possible."  The 2000 GAI did not include RLM or McAuliffe as indemnitors.  Regardless, Campisano never executed the 2000 GAI for himself or MC Management; Smith never requested that it be completed; and in fact, Campisano still retains the original, unsigned copy.

---

[3] The executed bonds reference the construction contract between the Owner and MC Management.  Of relevance to arguments in this opinion, the Performance Bond expressly relieves Frontier of liability if the Owner does not pay MC Management in accordance with the terms of the construction contract.  The Payment Bond does not make any statements related to the construction contract's effect on payment.

David Campbell, the head of the underwriting department of Frontier in Nashville, TN, verbally approved this bond transaction.[4]  On February 15, 2000, after executing the bonds, Smith sent a letter to Campbell stating the particulars of the deal.  Smith highlighted Campisano and his companies' past work on sizable projects and a "very favorable bank reference."  Smith attached support for the bond, including Campisano's personal strength and guarantee, his liquid assets and real estate, his tax returns, and his corporate statement.  He did not reference McAuliffe, RLM, or any entity other than MC Management.  No one ever requested financial information from McAuliffe, RLM, or MC Construction.

After a few months, signs of problems arose.  In December 2000, subcontractors and suppliers on the Haverford Place project began notifying Frontier about nonpayment.  Defendants failed to resolve these claims, so Frontier settled them for a total of $137,500.[5]  Frontier says that additional claims still pending against the Payment Bond exceed $830,000.  On December 7, 2000, Frontier notified M. C. Construction, Mark Campisano, Beverly Campisano, Robert McAuliffe, and Julie McAuliffe of their liability on the Haverford Place project bonds based on the 1992 and 1995 GAIs.[6]  That letter references M. C. Construction as the principal on the bond.

Soon afterwards, both Campisano and McAuliffe advised Smith that McAuliffe, Julie

---

[4] Although he has no specific recollection of this transaction, he believes that he would have followed company policy for approving bonds. This would have included obtaining financial information from the agent and then conducting financial analysis, working capital calculations, net worth calculations, and probably ordering a Dun & Bradstreet report on the company.  Such financial information would be expected from the businesses and indemnitors.  The parties dispute, however, whether such information would be required of all indemnitors or if, finding one indemnitors information satisfactory, Frontier may not have requested information from all indemnitors.

[5] The claims from eight companies totaled $378,617.87.

[6] Frontier later withdrew notice on the basis of the 1992 GAI as a mistake and stopped pursuing indemnity from Julie McAuliffe.

McAuliffe, and RLM were not indemnitors for the Haverford Place project bonds.   A few weeks later, Smith advised McAuliffe to put his concerns in writing and suggested that the situation "would work itself out."[7]  On December 20, 2000, McAuliffe informed Frontier that the bonds were issued in the name of MC Management, not M. C. Construction, and denied any interest in MC Management.  He requested that Frontier certify that he and his ex-wife Julie had no responsibility under the bonds.  Frontier did not respond to several such requests.         After receiving several claims from subcontractors against the bonds, Frontier advised Smith that it had "misplaced" the bond file.[8]  In response, Smith forwarded the 1992 and 1995 GAIs, but not the unexecuted 2000 GAI, to Frontier.  By this time, Frontier had already contacted the 1992 and 1995 indemnitors alerting them of their obligation on the Haverford Project Payment Bond.

By July, 2001, the project was at a standstill.  The Owner informed HUD that the remaining 20% of the project could not be completed because the Owner had insufficient cash. It had also received a letter of mortgage default.  According to Campisano, the Owner's failure to properly engineer and fund the project caused it to run out of money and fail.  The Owner disputes that claim.  To date, no party has reimbursed Frontier nor has any party posted collateral to support the outstanding reimbursement, despite Frontier's demands.  On November 22, 2006, Frontier instituted this action, seeking damages and additional collateral from the signatories to the 1995 GAI.

## II.

---

[7] McAuliffe sent the letter to Rick Kukosky at Frontier; he also sent it to Mark Campisano as representative of MC Management, and Matthew S. Elder of Crafton, Martin, Ogburn & Zipperle PLLC.

[8] There is some debate as to whether the file ever existed in total, based on Campbell's testimony that whatever was sent with the original documentation for the bonds should not have been removed from the file.

Summary Judgment is appropriate where no genuine issue of material fact exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party initially bears the burden of demonstrating that an essential element of the non-moving party's case is lacking. *Kalamazoo River Study Group v. Rcokwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999). The non-moving party may respond by showing that a genuine issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute exists where, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. The Court must "assume the truth of the non-moving party's evidence and construe all inferences from that evidence in the light most favorable to the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

### III.

The threshold question in this case is whether the 1995 GAI, which McAuliffe executed, applies to the Payment Bond on which Frontier seeks to recover. The question is two-fold: (1) would the 1995 GAI apply to the Payment Bond under general circumstances and (2) did any subsequent actions change its continuing applicability? The Court will first address whether the 1995 GAI could apply to the Payment Bond generally and then will address the effect of subsequent actions and circumstances.

### A.

The 1995 GAI is a valid written contract. A fundamental rule of contract law is that, "absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001). At the same time, "[t]he primary objective is to effectuate the intentions of the parties." *3D Enters. Contracting Corp. v.*

-8-

*Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) (citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)).  "When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions." *Id.* (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

The final paragraph of the 1995 GAI, directly above the signature lines, paragraph 19 clearly states in all capital letters that "the indemnitors hereby acknowledge that this agreement is intended to cover any bonds (whether or not covered by any application signed by any one or more of the indemnitors . . . ) heretofore or hereafter executed by the company on behalf of the indemnitors, or any one of them . . . over an indefinite period of years, until this agreement shall be cancelled in accordance with the terms hereof."  The only provision regarding termination states that the agreement "may be terminated by the Indemnitors, or any one or more of the parties so designated upon written notice to the Company of not less than ten (10) days . . ." Additionally, the 1995 GAI's terms expressly disclaim that Frontier has "to give the indemnitors, or any one or more of them, notice of the execution of any such bonds . . ."

M.C. Construction, Campisano, Beverly Campisano, MC Management, RLM Construction, and McAuliffe each executed the 1995 GAI as indemnitors.  According to its terms, the 1995 GAI applies to any bonds executed on behalf of any of the indemnitors.  Frontier executed the Haverford Place bonds in favor of MC Management.  Since MC Management is an indemnitor, the 1995 GAI applies by its express terms to the Haverford Place bonds and all the parties who signed the 1995 GAI are made indemnitors of the Haverford Place bonds.

Frontier did not notify any of the other indemnitors that it was executing these bonds.

The terms of the 1995 GAI do not require it to do so.  McAuliffe could have terminated his guarantee at any time.  However, after executing the 1995 GAI, no party sent Frontier a written notice of termination.  The application of the 1995 GAI is absolutely clear under its terms. Nevertheless, one must acknowledge that it does seem unfair as to McAuliffe and RLM. Consequently, the Court will explore whether some legal or equitable principle might excuse its enforcement.

## B.

Defendants argue that the 2000 GAI constitutes a novation, that is the replacement of an old contract with a new one.  To create a novation one must satisfy the same elements as a contract.  *See Daviess County Bank & Trust Co. v. Wright*, 110 S.W. 361, 363 (Ky. 1908).  This is so because it can only be effected if the parties intended to extinguish the old obligation by substituting a new one.  *Clark v. Thompson*, 219 S.W.2d 22, 28 (Ky. 1949).  No document here contains an express novation. The parties' intentions, however, need not  "be shown by express words," but instead can be "implied from the circumstances attending the transaction and the conduct of the parties thereafter."  *Watt's Adm'r v. Smith*, 63 S.W.2d 796, 798 (Ky. 1933) (citing *Kushner v. Knopf*, 13 S.W.2d 271 (Ky. 1929)).  The basic elements of a novation are "a previous valid obligation, the agreement of all the parties to the new contract, the extinguishment of the old contract, and the validity of the new contract."  William B. Bardenwerper, 5 Ky. Prac. Methods of Prac. § 43:3 (4th ed. 2008-2009) (citing 66 C.J.S. *Novation* § 3).

Several of the elements of a novation are absent here. The most glaring one is the absence of a valid new contract.  The 2000 GAI was never signed or executed.  Without a valid new GAI, a critical element necessary for a novation seems to be absent.  Also missing is any evidence

suggesting a genuine issue of intent to extinguish the old contract.  The very terms of the 2000 GAI make no such reference.  Thus, the 2000 GAI's existence cannot alone evidence Frontier's intent for the 2000 GAI to replace the 1995 GAI.  Defendants argue that since Frontier executed the 1995 GAI to replace the 1992 GAI the same intent should be inferred in this situation.  These prior dealings do not create the necessary genuine issue of intent here.  Similarly, Frontier's omission to get financial information from RLM or McAuliffe is insufficient to suggest an intent to extinguish the 1995 GAI.  The execution of a new GAI, which did not occur, is the only basis for inferring the intent to novate.  Absent this, the 1995 GAI cannot be extinguished under the theory of a novation.

## C.

Defendants also make an overarching argument on equitable grounds.[9]  As part of that argument, they say it is unfair to enforce the indemnity agreement where the parties never intended it and where Frontier never relied upon it.  Upon review, neither seems to be a valid reason to avoid enforcement of the 1995 GAI upon its clear terms.

To be sure, enforcing the 1995 GAI in this situation does seem to have some elements of unfairness.  After all, RLM and McAuliffe did not approve of the bonds, were not involved in the new bonded project, did not profit from the project, and may not have even known about the project.  The facts represent uncommon circumstances; rarely does a third party indemnify a

---

[9] Defendants RLM and McAuliffe asserted the defense that Frontier's claim is barred by KRS § 371.065. It requires that any guaranty of indebtedness must expressly refer to the instruments being guaranteed or must be in writing, signed by the guarantor and specify the amount of the maximum liability of the guarantor and a termination date.  KRS § 371.065(1).  Such a defense is unavailable as the Kentucky Court of Appeals rejected that argument. *See Intercargo Ins. Co. v. B.W. Farrell, Inc.*, 89 S.W.3d 422, 426 (Ky. Ct. App. 2002).  It concluded that it does not apply to agreements to indemnify construction bonds because that agreement is not a guaranty of indebtedness, but instead "creates a direct, *primary* liability between the promisor and promisee that is original and independent of any other obligation." *Id.*

bond for which that party stands to gain nothing.  Generally, indemnitors co-sign an agreement where all the parties serve to benefit from the joint signing, such as where the indemnitors work jointly on projects and will all profit from the bonded project.  The continuing indemnity agreement itself, however, is not inherently unfair.  Only its application on these facts seems so.

1.

RLM and McAuliffe argue about various parties' intentions at the time the bonds were issued.  Yet the broad language of the 1995 GAI makes those intentions clear and unambiguous. Nothing in that broad language suggests any limitations on its applicability.  Application to this circumstance raises a flag only because it seems arguably beyond the purview of the parties' contemplation at the time they entered the agreement.  RLM and McAuliffe were no longer engaged in a joint venture with Campisano and MC Management;  RLM and McAuliffe were not engaged in the Haverford Project and would not stand to benefit from it at all.

Such equitable considerations, however, provide no basis for voiding the clear applicability of this unambiguous 1995 GAI.  *Cf. Codell Const. Co. v. Commonwealth*, 566 S.W.2d 161, 164 (Ky. Ct. App. 1977) (noting that absent ambiguity, a contract is enforced according to its terms).  The Court finds no Sixth Circuit or Kentucky case law that suggests the Court should ignore the clear, broad language of the indemnity agreement in favor of the subjective intentions in the minds of the parties.

2.

A related issue arises due to Frontier's apparent lack of reliance on the 1995 GAI when issuing the Haverford Place bonds.  Clearly, Frontier did not rely either upon McAuliffe's financial wherewithal or his guarantee when it issued the Haverford bonds.  In particular,

-12-

Smith's correspondence with Campbell does not mention the 1995 GAI, Frontier never requested any financial information from RLM or McAuliffe, and Frontier provided Campisano with a new indemnity agreement.  Indeed, Frontier seems to have discovered the 1995 GAI almost as an afterthought upon realizing that the 2000 GAI was never executed.

Notwithstanding these circumstances, the enforceability of the 1995 GAI's plain language does not depend upon Frontier's reliance.  *Cf. Lennar Homes, Inc. v. Masonite Corp.*, 32 F. Supp. 2d 396, 399 (E.D. La. 1998) (stating that "reliance is unnecessary to demonstrate a binding contract if the warranty is memorialized in writing" and that the beneficiaries "need not prove reliance to sustain a breach of contract claim"); JOSEPH M. PERILLO, CALAMARI AND PERILLO ON CONTRACTS 9 (West 2003) (1970) ("a contract, once made, is binding and an action for breach may be instituted although the contract is repudiated before it induces any action or inaction in reliance upon it.").[10]

Since the Court has previously concluded that no operation of law terminated the entire agreement and no individual terminated it as it applied to him or it, defendants RLM and McAuliffe's equitable arguments provide little ground on which to excuse either from the obligation to which they agreed.  As a matter of contract law, reliance on an agreement is unnecessary to enforce it.  In any case, reliance would only come into play when executing the

---

[10] The doctrine of promissory estoppel inversely suggests this conclusion.  "The whole theory of a promissory estoppel action is that detrimental reliance becomes a substitute for consideration under the facts of a given case."  *McCarthy v. Louisville Cartage Co., Inc.*, 796 S.W.2d 10, 12 (Ky. App. 1990) (citing Calamari and Perillo, *The Law of Contracts*, Hornbook Series § 105 (1970)).  Promissory estoppel allows the parties to enforce the promises they relied on, even though the promises were made without consideration, merely because of the parties' reliance.  *Id.*  It stands to reason that if reliance stands in the place of consideration, where there is consideration reliance is not required.  Such is the case at hand.  The parties formed the 1995 GAI by fulfilling the formal requirements of contract formation, namely the exchange of promises for consideration.  The 1995 GAI formed a binding contract for consideration.  Such a contract does not need subsequent reliance on it to maintain its enforceability.

GAI, not when issuing the bonds.  The Court finds neither legal authority nor an equitable principle that would void an indemnity agreement for lack of specific reliance when issuing a subsequent bond.[11]

## D.

For the reasons stated, none of these equitable arguments permit the Court to disregard a clearly written contract.  When courts have refused to enforce agreements on the basis of equity, generally it is based on the finding of unconscionability.  *See, e.g.*, *Mortgage Elec. Registration Sys., Inc. v. Abner*, 260 S.W.3d 351, 354 (Ky. Ct. App. 2008). Voiding this agreement on some unspecified lesser equitable ground would be at odds with the basic notion of the freedom of contract, which holds that parties are bound to their contracts even if those contracts are unwise and foolish.  Richard A. Lord, 8 Williston on Contracts § 18:1 (4th ed. 2008).  Contract law repeatedly recognizes people's freedom "to enter into contracts that actually may be unreasonable or which may lead to hardship on one side."  *Id.*  Although RLM and McAuliffe received no direct benefit from the Haverford Place project for which they must now provide indemnity, the parties freely entered into an agreement that clearly applies to this situation.  Both parties could easily have prevented this result by providing written notice terminating the 1995 GAI.  The Court is unwilling to find this agreement unconscionable.  Since the parties did nothing to change the applicability of the 1995 GAI, the Court will enforce it according to its

---

[11] The Court, however, has found several courts that enforce continuing guaranty agreements, which cover all transactions, even those arising in the future, to be enforceable.  *Gen. Elec. Capital Corp. v. Transp. Logistics Corp.*, 893 A.2d 467, 471 (Conn. App. Ct. 2006); *Fid. Nat. Bank of S. Miami v. Melo*, 366 So.2d 1218, 1221 (Fla. Dist. Ct. App. 1979); *Commercial Nat'l Bank in Shreveport v. Keene*, 561 So.2d 813, 815 (La. Ct. App. 1990); *Chem. Bank v. Sepler*, 457 N.E.2d 714, 716 (N.Y. 1983).  *But see Phelps Dodge Corp. v. Schumacher Elec. Corp.*, 415 F.3d 665, 668 (7th Cir. 2005); *William R. Hubbell Steel Corp. v. Epperson*, 679 So.2d 1131, 1133 (Ala. Civ. App. 1996); *Borg Warner Acceptance Corp. v. Shakopee Sports Ctr., Inc.*, 418 N.W.2d 749, 750 (Minn. Ct. App. 1988) (each imposed a reasonable time limitation on unlimited continuing guarantees).

terms.  The 1995 GAI applies to the Payment Bond and binds all its signatories.

## IV.

Some courts in other jurisdictions have held that "any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity."  *Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 529 (5th Cir. 1959) (citing *U.S. Fid. & Guar. Co. v. Putfark*, 158 So. 9, 10 (La. 1934)).[12] The Third Circuit explained that such a duty exists where the "indemnitor had good reason to believe that the potential loss it was risking was less than the loss that actually occurred."  *First Jersey Nat'l Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 342 (3d Cir. 1983).  If that "indemnitee is responsible for putting the indemnitor in such a precarious position, the indemnification may be discharged."  *Id.*  One very old Kentucky opinion expresses a similar ability to discharge an indemnity agreement where the indemnitor increased the indemnitee's liability.  *See Bridgeford v. Burbank*, 1875 WL 11685, *5 (Ky. 1875).  Otherwise, Kentucky courts have provided no clear direction how or even whether they might apply such a general principle.

To have a potential impact under any such theory, the principal's act must materially alter RLM and McAuliffe's risk.  So, the Court must determine the scope of the risk Defendants

---

[12] *See also First Jersey Nat'l Bank*, 723 F.2d at 342 (recognizing indemnitor's duty not to prejudice the indemnitee's rights or increase the indemnitee's risk of loss); *Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.* 484 F.2d 877, 878 (7th Cir. 1973) (recognizing the right to discharge an indemnity agreement if the indemnitee materially increases the indemnitor's risk under it); *Denton v. Fireman's Fund Indem. Co.*, 352 F.2d 95, 99 (10th Cir. 1965) (recognizing right to discharge for materially increasing indemnitor's risk); *Am. Cas. Co. v. Idaho First Nat'l Bank*, 328 F.2d 138, 142-43 (9th Cir. 1964) (citing the principle laid out in *Hiern*, 262 F.2d at 529); *In re Tech. for Energy Corp.*, 140 B.R. 214, 222 (Bk. E.D. Tenn. 1992) (stating that "[t]he surety has a duty to indemnitors to use its underwriting skills to limit their exposure to loss," where the surety has the ability to increase the penal sum stated in the bond.).

undertook by signing the 1995 GAI.[13]  Unfortunately, that risk was quite extensive.  As previously discussed, the 1995 GAI included a continuing indemnity provision, by which all Defendants agreed to provide indemnity on any bonds issued to any other individual indemnitor indefinitely.  The agreement obviously applied to subsequent construction contracts.  Under a plain application of its terms there is no basis for concluding that any defendants' risk was increased; the 1995 GAI expressly contemplated this liability.  Though the dollar amount of the risk increased, the legal scope of it was consistent with the 1995 GAI provisions.

Defendants RLM and McAuliffe argue that Smith, acting as an agent for Frontier, failed to satisfy certain underwriting guidelines and minimum information requirements.  No doubt it is true that if Smith had contacted RLM and McAuliffe, they would have immediately terminated their part of the 1995 GAI.  However, it is not clear that Smith, acting as an agent for Frontier, had a duty to RLM and McAuliffe with regards to future bonds issued.  In fact, the 1995 GAI expressly disavows any requirement to notify the indemnitors of future bonds issued.  To be sure, Smith had duties to Frontier, but his alleged failure to perform them would not be enforceable by McAuliffe.  At worst, Frontier simply failed to help RLM and McAuliffe minimize their risk.  Even if Frontier had some duty to limit RLM and McAuliffe's exposure, that duty would only require Frontier to avoid increasing the risk, not require Frontier to help RLM and McAuliffe minimize their exposure.  Neither Smith nor Frontier's actions serve to discharge the 1995 GAI.                                              **V.**

---

[13] Chief Judge Russell used similar analysis in *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 902, 913 (W.D. Ky. 2007).  This case concerned the liability of a purchaser to indemnify the seller of an industrial plant for any future environmental hazard related costs.  Using the same analysis that this Court has employed, Judge Russell concluded that the purchaser had broadly agreed to pay these costs in the future and that an increase in that liability was within the terms of the indemnity agreement because the hazards existed at the time of the original agreement.

Defendants also attack Frontier on the grounds that its payments under the bonds were not made in good faith.  They argue that the Owner failed to comply with the payment provisions of the construction contract and that Frontier interfered with payments further by directing the Owner not to pay MC Management, the principal.  Defendants argue that the language of the Cost-Plus Construction Contract integrated with the Payment and Performance Bond language makes "clear" that the parties intended performance under the bonds to be "'conditioned on the full and faithful performance of the Contract' by the Owner."  (Dfs. Jt. Resp. to Pf.'s Mot. for Sum. J.).  This is not a strong argument.

The Performance and Payment Bonds state that the "Construction Contract is by reference made a part" of the bond.  It goes on to condition Frontier's liability as a surety on the Owner making "payments to [MC Management] strictly in accordance with the terms of [the Construction] Contract as to payments . . ."  The Payment Bond, however, does not contain any provisions conditioning Frontier's obligation under the bond on compliance with any payment provisions of the Construction Contract.  Neither bond incorporates the other bond.  The Construction Contract only references the Performance Bond, which it required MC Management to furnish as a means of assurance of completion of the work.  Although the Construction Contract outlines the Owner's obligations to MC Management, it makes no statement about the terms under which MC Management must pay its subcontractors and vendors.

Frontier only seeks to recover, through indemnity, claims paid under the Payment Bond. The fact that the Performance Bond specifically conditions the surety's liability on payment by the owner in strict accordance with the construction contract is not determinative of Frontier's

liability here.  No contractual terms in any of the documents suggest that MC Management's duty to pay the subcontractors or vendors was contingent on the Owner's payments to MC Management.  On the contrary, the bond language suggests that Frontier would actually have been liable to MC Management had it not paid the claims.  Frontier settled several of the claims for well below the claimed debt.  No evidence raises a question of material fact as to whether Frontier made any payments in good faith.

Case law from other jurisdictions supports the Court's rejection of the argument that indemnitors are not obligated to indemnify the surety for losses paid on payment bond claims if the owner of the project defaulted in its obligations to pay the contractor.  *See e.g., Liberty Mut. Ins. Co. v. Aventura Eng'g & Const. Corp.*, 534 F. Supp. 2d 1290 (S.D. Fla. 2008); *Frontier Ins. Co. v. Int'l, Inc.*, 124 F. Supp. 2d 1211 (N.D. Ala. 2000); *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579 (M.D. Pa. 1998); *Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Const. Corp.*, 975 F. Supp. 511, 516 (S.D.N.Y. 1997) (allowing a surety to recover under the indemnification agreement for payments made under the payment bond even though the principal claimed to have defenses to the payment).

## VI.

As part of its remedy, Frontier requests that the Court enforce the collateral security provision, which requires the indemnitors, upon Frontier's demand, to deposit a sum of money as collateral security equal to the reserve Frontier has set aside to satisfy the bond claims. Requiring indemnitors to post collateral to cover an indemnitee's potential liability is the type of specific relief that courts may require.  *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th

Cir. 1984).[14]  Specific performance ensures the creditor maintains the security position for which it bargained.  *Id.* (citing *Gen. Ins. Co. v. Howard Hampton Inc.*, 8 Cal. Rptr. 353 (Cal. Ct. App. 1960)).  This seems to be a reasonable view and no Kentucky or Sixth Circuit case law suggests a contrary result.

The Court will adopt the Ninth Circuit's reasoning.  The provision is clear and unambiguous in its requirement that the indemnitors post collateral once Frontier demands it.  The Court will enforce the provision according to its terms.  Since Frontier has made a demand for collateral, Defendants should provide the collateral pursuant to the terms of the 1995 GAI.

## VII.

RLM and McAuliffe also assert a counterclaim of fraud against Frontier.  They repeat this contention in their third party claim against Smith.  Two factual bases support Defendants' arguments for fraud: (1) Smith's presentation of the 1995 and 1992 GAI to Frontier in 2002 upon request and (2) Smith's statement that it will "work itself out," which he made to McAuliffe when McAuliffe called him to ask about the indemnity demand from Frontier.   This theory of fraud supports a number of Defendants' arguments against finding obligation as indemnitors and it would preclude Frontier from seeking indemnity under a theory of equitable estoppel.  Defendants argue that the fraud obligates Smith to indemnify them for any liability they may have to Frontier.

---

[14] *See also Am. Motorists Inc. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 299 (2d Cir. 1989); *Liberty Mut. Ins. Co.*, 534 F. Supp. 2d at 1320-21; *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 921 (E.D.N.Y. 1999); *U.S. Fid. & Guar. Co.*, 15 F. Supp. 2d at 588); *Ticor Title Ins. Co. v. Middle St. Officer Tower A Assocs.*, 768 F. Supp. 390, 392 (D. Me. 1991); *Safeco Ins. Co. of Am. v. Criterion Inv. Corp.*, 732 F. Supp. 834, 843 (E.D. Tenn. 1989).  *But see Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 954-55 (9th Cir. 1977) (holding that specific enforcement of the collateral security provision as to a third-party beneficiary was not available since the party had an adequate remedy at law).

Any claim for fraud against Frontier is premised on finding that Smith's actions were performed while he was an agent for Frontier.  Frontier is responsible for the acts of its agents, including any misrepresentations or material concealments.  *Gen. Interest Ins. Co. v. Ruggles*, 25 U.S. 408, 418 (1827).  Yet, a principal is only responsible for the acts its agent committed within the scope of its authority.  *Clark v. Burden*, 917 S.W.2d 574, 578-79 (Ky. 1996).  For purposes of the motion, the Court will assume that Smith acted in this capacity.

Kentucky requires the party claiming harm due to fraud to prove, by clear and convincing evidence, six elements: "(1) the declarant made a material misrepresentation to the plaintiff, (2) the misrepresentation was false, (3) the declarant knew it was false or made it recklessly, (4) the declarant induced the plaintiff to act upon the misrepresentation, (5) the plaintiff relied upon the misrepresentation, and (6) the misrepresentation caused injury to the plaintiff."  *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007) (citing *United Parcel Serv. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999)).

The misrepresentation "must relate to an existing or past fact."  *Radioshack Corp*, 222 S.W.3d at 262.  Opinions and promises for the future are not actionable.  *Church v. Eastham*, 331 S.W.2d 718, 719 (Ky. 1960) (citing *Livermore v. Middlesborough Town-Lands Co.*, 50 S.W. 6, 13 (Ky. 1899)).  A "[d]ishonest expression of opinion" that is deliberately expressed as false, or a promise made with no intention of carrying it out, however, may serve as a basis of a cause of action.  *Id.*

**A.**

First, the Court must examine the alleged fraudulent statements.  RLM and McAuliffe say that Smith assured McAuliffe that the situation would "work itself out."  McAuliffe claims in his answers to interrogatories that Smith told him "not to worry" and that Smith "would take care of it."  Smith's alleged statements to McAuliffe do not relate to an existing or past fact.  Rather, his statements can only be construed as those of opinion, promise, or a future potential fact.  Nothing suggests that Smith made that statement dishonestly or that subsequent to allegedly making the statement he deliberately avoided fulfilling such a promise.  For all these reasons, the alleged statements do not support a fraud claim.

Even if such statements could be construed as an intentional misrepresentation of future events, McAuliffe was not induced to act in a way that harmed him.  Neither RLM nor McAuliffe provides sufficient evidence to support the element of reliance.  McAuliffe claims that his reliance on Smith's statements induced him to inaction.  When asked in deposition what he would have done if he had not relied on Smith's statement, McAuliffe responded that he would have called an attorney.  In fact, McAuliffe did retain counsel within a year after the conversation, when Frontier failed to respond to any of his personal correspondence.

McAuliffe has also asserted that he would have completed the Haverford Project had he known he would have been liable as an indemnitor thereby avoiding the obligation now faced.  This is not a helpful argument for Defendants.  McAuliffe's ability to complete the project would have no bearing on these payments, particularly since the project was in financial disarray and the Owner was not making payments.  McAuliffe would not have resolved his liability by acting as the contractor.  The liability as an indemnitor in this case is based on work that was completed

and unpaid.  Stepping in at a later point to prospectively work on the project would not have resolved those outstanding debts.  Neither would McAuliffe stepping into Campisano's shoes have resolved the fact that the Owner was out of money and unable to pay the general contractor. Furthermore, if McAuliffe had involved himself in the project, he would have assumed liability as an indemnitor as he would then clearly be involved in the bonded project, thereby destroying any argument he may have regarding the inapplicability of the 1995 GAI.

Neither action McAuliffe suggests he may have taken, if Smith had not made his alleged statement, would support the element of reliance or harm to RLM or McAuliffe as required to prove fraud.

## B.

In October 2001, Frontier asked Smith to send the supporting documents for the Haverford Place bonds to replace the "misplaced" underwriting file.  Six months later, Smith sent the 1992 and 1995 GAI.  Defendants argue that he did this with the knowledge that neither McAuliffe nor RLM were involved in the Haverford Place project and that the 2000 GAI was intended to apply to these bonds.

Smith's sending the 1995 and 1992 GAI in response to Frontier's inquiries does not amount to fraud under any definition.  Although Smith may never have personally intended either agreement to apply to the Haverford bonds, the language of the agreements, taken at its letter, clearly makes them applicable to these bonds.  Thus no material misrepresentation inducing reliance that caused Defendants harm occurred.  Nor do Defendants present any evidence or make any argument suggesting how they may have relied on Smith's actions or inactions in a way that led to their harm.  Since Defendants provide no evidence to support

several of the elements of fraud, Defendants cannot support such a claim.[15]  Any argument or

motion premised on fraudulent action cannot be substantiated.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record

---

[15] Since a claim for fraud is unsubstantiated, the Court need not resolve the remaining issues on the claims for fraud.  These include statute of limitation arguments, accrual arguments, Rule 14 arguments, the failure to assert in the amended complaint in relation to Rule 15(a), and issues of agency related to the fraud claim.